CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

MAR 15 2007

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

**SHIRLEY J. BOWE,** )   Civil Action No. 1:06cv00077
   Plaintiff, )

)    **MEMORANDUM OPINION**

v. )

)

**MICHAEL J. ASTRUE,** )    By: GLEN M. WILLIAMS
**Commissioner of Social Security,**[1] )    SENIOR UNITED STATES DISTRICT JUDGE
   Defendant. )

In this Social Security case, the court affirms the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

Plaintiff, Shirley J. Bowe, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 *et seq.* (West 2003 & Supp. 2006). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

-1-

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Bowe protectively filed her application for DIB on or about October 17, 2003,[2] alleging disability as of July 24, 2003, due to diabetes, fibromyalgia, right knee pain, right knee ligament damage, lower back pain, deterioration in her lumbar spine, bulging discs in her lower back, a spinal cyst, right shoulder pain, right rotator cuff damage, right arm pain, right hand pain, neck pain, jaw pain, pain in the back of her head, problems sitting or walking for long periods of time and problems raising her arms. (R. at 19, 38, 72, 75, 96.) These claims were denied initially and upon reconsideration. (R. at 19, 31-35, 37-39.) Bowe then requested a hearing before an administrative law judge, ("ALJ"). (R. at 19, 40.) The ALJ held a hearing on July 27, 2005, at which Bowe was represented by counsel. (R. at 19, 504-32.)

By decision dated November 18, 2005, the ALJ denied Bowe's claims. (R. at 19-28.) The ALJ found that Bowe met the disability insured status requirements for

---

[2] The ALJ's opinion mistakenly indicates that Bowe filed for disability on December 3, 2003; this date appears, instead, to be the date upon which her application for DIB was received. (R. at 57.)

-2-

DIB purposes through December 31, 2008. (R. at 21.) The ALJ found that Bowe had not engaged in substantial gainful activity since July 24, 2003. (R. at 21.) The ALJ also found that the medical evidence established that Bowe suffered from severe impairments, namely disorders of the spine, right shoulder and right knee, but the ALJ concluded that Bowe did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21-25.) The ALJ determined that Bowe had the residual functional capacity to perform a wide range of light work[3] that did not involve climbing, moving machinery, unprotected heights and allowed limited reaching with her right arm. (R. at 25.) However, no limitations were placed on the use of Bowe's left upper extremity. (R. at 25.) Thus, the ALJ found that Bowe was unable to perform any of her past relevant work as a production worker, machine operator and bus driver. (R. at 26.) The ALJ noted that transferability of skills was not at issue in this case because all of Bowe's past relevant work was unskilled. (R. at 27.) As a result of these findings, and the testimony of a vocational expert, the ALJ concluded that, based on her age, education, work experience and residual functional capacity, Bowe could perform jobs existing in significant numbers in the national economy, including those of an amusement attendant, a construction flagger and a records clerk. (R. at 27.) Therefore, the ALJ found that Bowe was not under a disability as defined in the Act and that she was not eligible for benefits. (R. at 19, 28.) *See* 20 C.F.R. § 404.1520(g) (2006).

After the ALJ issued his decision, Bowe pursued her administrative appeals.

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, she also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2006).

Case 1:06-cv-00077-GMW-PMS   Document 14   Filed 03/15/07   Page 3 of 34   Pageid#: 66

(R. at 14-15). The Appeals Council denied her request for review on May 16, 2006. (R. at 6-9.) Bowe then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2006). The case is before this court on the Commissioner's motion for summary judgment filed December 14, 2006, (Docket Item No. 12).[4]

## II. Facts

Bowe was born in 1954. (R. at 26, 57, 72, 507.) Thus, pursuant to 20 C.F.R. § 404.1563(d), Bowe was considered to be a "person closely approaching advanced age" at the time of the ALJ's opinion; but, Bowe was classified as a "younger individual" at the time of her alleged onset date. (R. at 26, 57, 72, 507.) She has a general equivalency development, ("GED"), diploma and past relevant work experience as a production worker, a machine operator and a bus driver. (R. at 26, 80, 82-86, 117.) As all of these jobs were unskilled, she has no transferable skills. (R. at 27.)

At her hearing on July 27, 2005, Bowe testified that she had not worked since July 2003. (R. at 508-09.) Bowe stated that she had several surgeries that prevented her from returning to work, including surgeries on her right rotator cuff, her gallbladder and her right knee. (R. at 510-11.) She also testified that she had been diagnosed with serial negative rheumatoid arthritis which caused pain in her hands and wrist. (R. at 512.) Bowe claimed that her hands were getting worse, particularly her right hand. (R. at 512-13.) She stated that she had swelling in her hands, that she

---

[4] Bowe did not file a motion for summary judgment in this case.

Case 1:06-cv-00077-GMW-PMS   Document 14   Filed 03/15/07   Page 4 of 34   Pageid#: 67

had developed knots on her finger joints and that her fingers were beginning to turn inwards. (R. at 512-13.) Bowe reported that she was unable to wash dishes for more than five minutes before her hands would begin to hurt and burn. (R. at 513.) She complained that her hand pain would radiate into her fingers, arm and right shoulder. (R. at 513.) Bowe also stated that she could not reach upward with her right arm to put something on a shelf and she would experience pain reaching straight forward with her right arm. (R. at 513-14.)

In terms of her mobility, Bowe stated that she could walk for only approximately five minutes without pain and the need to stop because of right knee and leg pain. (R. at 514-15.) She also stated that she could not walk on a rough or uneven surface like grass. (R. at 515.) Bowe testified that she could still do household chores, but they took her much longer to complete than they did in the past because her pain required her to take frequent breaks. (R. at 518.) Bowe also stated that she experienced some pain in her back, neck, head and bowels. (R. at 518-19.) Bowe further testified that she was able to sit but, after a while, she would begin to experience numbness and need to lie down. (R. at 519.)

Bowe's sister, Joanne Griffin, was present and testified at Bowe's hearing. (R. at 520-24.) Griffin testified that she saw Bowe frequently and would often allow Bowe to stay at her house. (R. at 521.) Griffin testified that she noticed that Bowe's hands were developing knots and "turning more and more to the outside." (R. at 521.) She also testified that Bowe had trouble lifting and holding onto items with her hands. (R. at 521-22.) Griffin stated that Bowe tried to help around the house, but Bowe would frequently have to stop and rest. (R. at 522.) Griffin also noted that Bowe would frequently need to reach with her left hand and arm because of her right

-5-

arm pain. (R. at 522-23.)

Barry S. Hensley, Ed.D., a vocational expert, also testified at Bowe's hearing. (R. at 524-30.) Hensley was first asked by the ALJ to characterize Bowe's past employment history. (R. at 525.) He stated that Bowe's employment as a bus driver was light, semi-skilled work, her employment as a production worker/inspector was medium[5] to heavy,[6] unskilled work and her employment as a machine operator was medium, unskilled work. (R. at 525.) The ALJ then asked Hensley questions about Bowe's employment prospects. (R. at 526.) In his questioning, the ALJ asked Hensley to assume that Bowe was not restricted in her ability to occasionally lift items weighing more than 20 pounds, that she could frequently lift items weighing 10 pounds, that she could stand for a total of six hours in an eight-hour work day and that she could sit for a total of six hours in an eight-hour work day. (R. at 526.) The ALJ also stated that Bowe had never climbed ladders or scaffolds, had no experience with exposure to hazards and could not perform excessive overhead reaching with her right arm. (R. at 526). Based on these limitations, Hensley stated that Bowe would be unable to perform any of her past work. (R. at 526.) However, Hensley found that an individual with the limitations the ALJ described, including the past work history, education and physical limitations, could perform work as an amusement attendant, a video store clerk, a records clerk and a construction flagger. (R. at 526-27.) Hensley stated that this would put the individual in the light, unskilled range of

_____

[5] Medium work involves lifting items weighing up to 50 pounds with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, she also can do light work or sedentary work. *See* 20 C.F.R. § 404.1567(c) (2006).

[6] Heavy work involves lifting objects weighing up to 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can perform heavy work, she also can perform medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(d) (2006).

Case 1:06-cv-00077-GMW-PMS   Document 14   Filed 03/15/07   Page 6 of 34   Pageid#: 69

available employment.  (R. at 527.)

Hensley was questioned by Bowe's attorney about the difference between the number of jobs available to a hypothetical person who was restricted to unskilled, light work that did not involve climbing, hazards, heights and extension of the right arm and someone who was simply restricted to the full range of unskilled, light work. (R. at 528.) Hensley replied that these additional limitations eliminated about 80 to 85 percent of the jobs available to an individual able to undertake the full range of unskilled, light work. (R. at 529.) Hensley was further asked about the job prospects for an individual who was restricted in the use of her hands and fingers bilaterally, in addition to the restrictions described by the ALJ. (R. at 529.) Hensley replied that this limitation would basically eliminate the ability to undertake light work. (R. at 529-30.) Additionally, Hensley stated that if a hypothetical individual with the same limitations described by the ALJ was further limited in her ability to walk for more than five or 10 minutes, that individual would not be able to perform any of the jobs previously described. (R. at 530.)

In rendering his decision, the ALJ reviewed records from Dr. Sam Samarasinghe, M.D.; Dr. Brian M. Strain, M.D.; Carilion Health System; Roanoke Orthopaedic Center; CFM-Daleville; Dr. Randall Hays, M.D., a state agency physician; Dr. Stephen L. Hill, M.D.; Carilion Family Medicine-Roanoke-Salem; CRMH Rheumatology Clinic and Carilion Surgical Care-Roanoke.  Bowe's attorney submitted additional documents to the Appeals Council from Carilion Physical Medicine and Rehabilitation; Carilion Health System; Dr. Catherine L. Daniel, M.D., Dr. Trevar O. Chapmon, M.D.; Carilion Bone and Joint Center; Shirley J. Bowe and

C. Cooper Geraty, Esq.[7]

Prior to Bowe's alleged date of disability, she presented to CFM-Daleville on August 8, 2002, complaining of pain in her right leg, back and muscles. (R. at 380.) Dr. Daniel R. Jones, M.D., noted that she had been diagnosed with fibromyalgia, but Bowe denied experiencing any joint pain, joint swelling, muscle weakness, stiffness or arthritis. (R. at 380-81.) She had a normal gait, as well as normal alignment and mobility throughout her digits, head, neck, spine, ribs, pelvis, right arm, left arm and left leg. (R. at 381.) A shin splint was noted on her right tibia. (R. at 381.)

On October 24, 2002, Bowe returned with lower right abdomen pain, right leg pain and joint pain. (R. at 316-18, 374-76.) She described it as burning, with occasional numbness and tingling into her leg; she also described having mild swelling over the posterior lateral aspect of the knee. (R. at 316, 374.) Dr. Gregory Stidham, M.D., found mild swelling over the post lateral knee area with no redness, heat or swelling and diagnosed her fibromyalgia as having deteriorated with minor neuralgia/neuritis not otherwise specified. (R. at 318, 376.) She was prescribed Bextra. (R. at 318, 376.)

Bowe returned to CFM-Daleville on January 22, 2003, with complaints of leg and back pain, as well as numbness and weakness in her left leg. (R. at 310-12, 368-70.) Dr. Jones diagnosed Bowe with deteriorated generalized osteoarthritis at multiple sites, lower back pain syndrome and lumbago. (R. at 311, 369.) He also

---

[7] Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 6-9), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health and Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991)

Case 1:06-cv-00077-GMW-PMS   Document 14   Filed 03/15/07   Page 8 of 34   Pageid#: 71

documented mild degenerative changes in both the lumbar spine and pelvis based on an x-ray performed on January 22, 2003. (R. at 309, 311, 367, 369.)

On March 30, 2003, Bowe complained of a right knee injury that occurred while she was bowling. (R. at 300, 358.) Bowe stated that she was unable to bend or walk on her right knee/leg. (R. at 300, 358.) She also reported moderate pain. (R. at 300, 358.) X-rays found posterior displacement of her tibia/fibula compared to her femur. (R. at 300, 358.) Dr. Kelli L. Linick, M.D., commented that Bowe might have a cruciate tear. (R. at 300, 358.) Bowe was scheduled for orthopedic evaluation and given Darvocet and Ansaid for the pain and swelling. (R. at 300, 358.)

As a result, Bowe was referred to the Roanoke Orthopaedic Center, ("ROC"), to evaluate her right knee pain. (R. at 172, 300, 358.) Bowe was seen on March 31, 2003. (R. at 172.) Additional x-rays were taken of Bowe's knee, laterally, which indicated no bony abnormalities, no arthritic change and no fractures. (R. at 172.) Bowe was diagnosed with a grade III anterior cruciate ligament, ("ACL"), sprain of the right knee. (R. at 172.) Bowe was given range of motion exercises, Darvocet for pain and instructions to remain active on her knee as much as tolerable through the rehabilitation process. (R. at 172-73.) Additionally, Bowe was instructed to miss work for two to three weeks. (R. at 170.)

On April 10, 2003, Bowe returned to CFM-Daleville with continued complaints of knee pain. (R. at 297, 355.) Dr. Jones reviewed the x-rays of Bowe's knee and found them to be normal and diagnosed a knee strain/sprain not otherwise specified. (R. at 298, 356.) Bowe went back to ROC on April 15, 2003. (R. at 169.) While she reported she was generally doing better, she continued to experience some

-9-

right knee pain and instability. (R. at 169.) Dr. Brent M. Johnson, M.D., ordered an MRI to further evaluate a possible right knee Grade II ACL sprain and possible meniscus tears. (R. at 169.)

Bowe returned to ROC on May 8, 2003, noting improvement in her right knee pain; however, she stated that her knee would occasionally "give out." (R. at 168.) Bowe also stated that she felt ready to return to work. (R. at 168.) Dr. Johnson reviewed her MRI and diagnosed a complete disruption of the ACL, but noted no evidence of meniscal pathology. (R. at 168.) She was ordered to continue strengthening exercises and a knee brace was suggested. (R. at 168.)

On June 25, 2003, Bowe returned to CFM-Daleville with severe neck and bilateral shoulder pain. (R. at 292, 350.) X-rays found minimal degenerative changes of both shoulders and cervical spine. (R. at 293, 351.) However, her gait, digits, head, neck, spine, ribs, pelvis, arms and legs were all found to be normal. (R. at 293, 351.) Dr. Jones also noted a normal range of motion, normal strength no joint enlargement and no tenderness in any of Bowe's arms or legs. (R. at 293, 351.) Again Bowe's fibromyalgia was diagnosed as deteriorated. (R. at 293, 351.)

On August 18, 2003, Bowe returned to see Dr. Jones complaining that her right knee had buckled, causing her to fall, and that she continued to experience bilateral shoulder pain and right knee pain. (R. at 277, 335.) Based on an x-ray of the right knee, Dr. Jones referred Bowe to Dr. Dallas P. Crickenberger, M.D., for an orthopedic evaluation. (R. at 277, 335.) On August 27, 2003, Dr. Crickenberger examined Bowe, who was continuing to complain of right knee pain and instability. (R. at 219-21, 274-76, 332-34.) She described her pain as being an eight on a scale

-10-

of 10. (R. at 220, 275, 333.) Dr. Crickenberger found that her right knee had good range of motion, collateral ligaments were stable, no joint pain, no calf pain and no popliteal fullness, but there was some apprehension when stress was placed on collateral ligaments. (R. at 220, 275, 333.) Dr. Crickenberger noted that an MRI performed on April 30, 2003, showed a complete tear of the ACL in the right knee. (R. at 220, 275, 333.) Dr. Crickenberger referred Bowe to Dr. John Mann, M.D., for a surgical consultation. (R. at 221, 276, 334.)

Bowe returned to Dr. Crickenberger on September 10, 2003, with bilateral shoulder pain with more pronounced pain in the right shoulder and vague neck pain in an ill-defined location. (R. at 217.) Her right shoulder pain increased slightly with range of motion of the shoulder, and radiated down toward the elbow. (R. at 217-18.) However, Dr. Crickenberger noted no major weakness in either shoulder and a good range of motion in both shoulders. (R. at 217-18.) Her cervical spine had a good range of motion with no radicular pain with range of motion and no pain with motion of the neck was noted. (R. at 218.) Dr. Crickenberger ordered an MRI of Bowe's right shoulder. (R. at 218.)

The MRI performed by Dr. Jackson W. Kiser, M.D., on September 11, 2003, found normal-appearing joint relationships, bony trabecular patterns and surrounding soft tissues were demonstrated, no fracture, dislocation or pathologic destructive process identified and a note of a rotary upper thoracic levoconvex scoliosis was made. (R. at 215.) Dr. Kiser described a small full-thickness tear of the insertional aspect anteriorly of the supraspinatus tendon and immediately inferior to the supraspinatus tendon a potential perforation was noted. (R. at 213.) Additionally, Dr. Kiser noted evidence of a marrow contusion with no occult fracture in the greater

Case 1:06-cv-00077-GMW-PMS   Document 14   Filed 03/15/07   Page 11 of 34   Pageid#: 74

tuberosity subjacent to the superspinatus tear, as well as mild subacrominal spurring and a type II acromion. (R. at 213-14.) Dr. Crickenberger confirmed and discussed these results with Bowe on September 17, 2003. (R. at 210-11.) Upon examination, Dr. Crickenberger continued to note a good range of motion in both shoulders and noted that Bowe's left shoulder had no symptoms or pain. (R. at 210.) Dr. Crickenberger ordered an MRI of Bowe's cervical spine to rule out any neck problems as a source of Bowe's right shoulder and neck pain. (R. at 211.)

Also on September 11, 2003, Bowe was evaluated by Dr. Sam Samarasinghe, M.D., of Comprehensive Pain Management Centers upon referral by Dr. Jones. (R. at 129-33.) At this time, it was concluded that Bowe suffered from osteoarthritis, degenerative disc disease of the lumbar and cervical spine and myofascial pain syndrome. (R. at 132.) Bowe was prescribed Baclofen, Ultram and Motrin. (R. at 132.) It also was noted that Bowe was not a candidate for opioid therapy at that time although opioid therapy and opioid agreements were discussed and explained to her. (R. at 132.)

An MRI of the cervical spine performed on September 23, 2003, found a soft tissue mass with erosion at the T-4 vertebra. (R. at 205.) The MRI indicated a C3-4 mild disc bulge, C4-5 right foraminal stenosis and C5-6 mild disc bulge. (R. at 205.) Additionally, a cystic lesion was found at the vertebra bodies of T3-4 on the right along with scalloping of the vertebra. (R. at 205.) A surgical assessment was ordered. (R. at 206.)

On October 7, 2003, Bowe returned to see Dr. Samarasinghe. (R. at 128.) He noted that her pain had not changed and it continued to impact her neck, upper back

and shoulders. (R. at 128.) As a result, Dr. Samarasinghe prescribed Darvocet for her pain because the Ultram previously prescribed was not helping her symptoms. (R. at 128.)

On October 14, 2003, Dr. Crickenberger referred Bowe to Dr. Brian Strain, M.D., a thoracic surgeon, to evaluate removal of the cyst. (R. at 203-04.) On October 22, 2003, CT scans were taken of the thoracic spine. (R. at 201-02.) The scan of the thoracic spine was entirely normal in appearance except for the cystic mass. (R. at 201.) The CT scan showed only age appropriate degenerative changes aside from the cystic mass. (R. at 200.)

On October 21, 2003, Bowe returned to ROC for evaluation of the right knee by Dr. Mann. (R. at 166-67) Dr. Mann continued to diagnose Bowe with a tear of the ACL of the right knee. (R. at 167.) Dr. Mann recommended conservative management because there was no giving way in her knee during Bowe's activities of daily living. (R. at 166-67.) He also noted that he believed that Bowe had returned to work. (R. at 167.)

Dr. Strain evaluated Bowe's cyst on November 5, 2003, and indicated that he was not certain that Bowe's pain was related to the cyst and that he did not believe that removal of the cyst would be likely to improve the pain she was experiencing. (R. at 143-46.) In fact, Dr. Strain stated that he believed her pain would likely be worse after surgery. (R. at 143.)

Bowe continued to see Dr. Crickenberger, in anticipation of surgery on her cyst. (R. at 195-206.) On December 10, 2003, Dr. Crickenberger noted that Bowe

-13-

was seen by Dr. Scherer, a neurosurgeon, who informed her that he did not believe her neck pain or occipital pain was related to the cyst, and Dr. Scherer was not sure whether middle scapular pain was related. (R. at 195.) Dr. Crickenberger discussed this report with Bowe. (R. at 195-96.) Prior to surgery Bowe again saw Dr. Strain on December 17, 2003. (R. at 142.) At this time, Dr. Strain again explained that surgery would not be likely to improve much of the pain she was experiencing, but that it might help. (R. at 142.) Bowe elected to proceed with surgery. (R. at 142.) On January 13, 2004, Dr. Strain removed the cystic mass. (R. at 136-41, 264-66.) Bowe returned to see Dr. Strain for a post-operative follow up appointment on February 5, 2004. (R. at 134-35.) Bowe complained of a great deal of post-operative pain, and Dr. Strain stated that, as he had warned, the surgery had not helped reduce Bowe's pain. (R. at 134-35.) Because her current pain medication was not helping with the increased post operative pain, Dr. Strain temporarily placed Bowe on OxyContin and Percocet. (R. at 134-35.) He indicated that Bowe might have problems with long-term pain. (R. at 135.)

On March 4, 2004, Bowe returned to see Dr. Mann for a re-examination of her right knee due to instability and her right shoulder. (R. at 165.) An examination of a new MRI scan of her right shoulder revealed a rotator cuff tear of the supraspinatus, and she was scheduled to follow up with Dr. Johnson for this problem. (R. at 164-65.) Dr. Mann continued to diagnose a torn ACL in her right knee, and Bowe elected surgical repair. (R. at 164.)

Bowe returned to Dr. Crickenberger on March 17, 2004, with complaints of pain in her right shoulder with throbbing and burning. (R. at 193-94, 248-49.) Bowe indicated that she had been scheduled for knee surgery by Dr. Mann, but that she also

-14-

was anxious to have her shoulder repaired after her knee surgery. (R. at 194, 249.)

On April 23, 2004, Dr. Mann performed arthroscopically assisted ACL reconstruction of the right knee using patellar tendon allograft. (R. at 153-56, 177-79.) A postoperative visit on April 27, 2004, found Bowe to have full extension and she was able to flex to 85 degrees. (R. at 160.) She was scheduled for physical therapy. (R. at 160.) On May 10, 2004, Bowe was again seen by Dr. Mann who noted that she had healed nicely. (R. at 158.) Bowe continued to have full extension and could flex up to 105 degrees. (R. at 158.) She was instructed to continue physical therapy and that she could return to work on July 1, 2004. (R. at 158.) Bowe's final visit to Dr. Mann occurred on June 14, 2004. (R. at 157.) Dr. Mann again indicated that Bowe had healed nicely, her strength was reasonably good and that she could return to work on July 23, 2004. (R. at 157.)

On June 22, 2004, Bowe reported to Dr. Crickenberger that her right shoulder pain had improved. (R. at 192, 238.) She returned to Crickenberger in July and received a right shoulder injection for an MRI. (R. at 188, 237.) Results of this MRI indicated that her rotator cuff tear was unchanged from 2003, and Bowe elected to undergo surgical repair. (R. at 186-87, 189, 235-36.) She received a pre-operative clearance for right shoulder surgery on July 14, 2004. (R. at 232.) On August 5, 2004, Dr. Crickenberger performed surgery to repair the longitudinal tear in Bowe's rotator cuff. (R. at 182-85, 224-27.) On August 10, 2004, Dr. Crickenberger performed a follow-up examination and found Bowe to be experiencing only mild pain and "doing quite well." (R. at 180-81.)

Dr. Randal Hays, M.D., a state agency physician, completed a residual

functional capacity assessment on June 29, 2004, and determined that Bowe had the residual functional capacity to perform light work. (R. 382-89.) Dr. Hays indicated that Bowe's ability to push and/or pull was limited in her upper extremities. (R. at 383.) Dr. Hays indicated that Bowe could frequently balance, stoop, kneel, crouch and crawl, but never climb ramps, stairs, ladder, ropes and scaffolds. (R. at 385.) Dr. Hays found that she had limited ability to reach in all directions with her right arm, but unlimited ability to reach in all directions with her left arm. (R. at 385.) No manipulative limitations in handling, fingering and feeling were noted in either arm. (R. at 385.) Dr. Hays also found no visual, communicative or environmental limitations, except that Bowe should avoid any exposure to machinery and height hazards. (R. at 387.) Finally, Dr. Hays found that Bowe could occasionally lift and/or carry items weighing up to 20 pounds, could frequently lift and/or carry items weighing up to 10 pounds, could stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday and could sit with normal breaks for a total of about six hours in an eight-hour workday. (R. at 383.)

In making this determination, Dr. Hays described the impairments Bowe had alleged in her disability claim, namely "cyst on spine between shoulder blades, tears in right rotator cuff, diabetes, fibromyalgia, right knee problems, low back problems, loss of mobility, cannot sit or walk for long periods of time and cannot raise her arms to fix her hair." (R. at 75, 384.) Dr. Hays indicated that a number of these problems had been repaired surgically including the cyst and Bowe's knee. (R. at 384.) Dr. Hays also indicated that Dr. Mann had cleared Bowe to return to work on July 24, 2004. (R. at 384.) Dr. Hays's assessment was affirmed by Dr. Frank M. Johnson, M.D., another state agency physician, on September 20, 2004. (R. at 389.) Dr. Johnson also indicated that the repair to Bowe's knee had healed and that she was

able to return to light work. (R. at 389.) Dr. Johnson noted that Bowe had recently undergone rotator cuff surgery and was recovering well postoperatively. (R. at 384.)

Following Bowe's hearing before the ALJ, Bowe submitted additional evidence to the ALJ. (R. at 390-473.) On August 21, 2004, Bowe was hospitalized by Dr. Stephen L. Hill, M.D., due to severe mid-epigastric pain. (R. at 391.) On August 24, 2004, Dr. Hill surgically removed Bowe's gallbladder. (R. at 390.)

Bowe continued to see Dr. Crickenberger for follow-up appointments regarding her rotator cuff surgery on September 14, 2004, October 19, 2004, December 17, 2004, February 11, 2005, and April 15, 2005. (R. at 416-23, 466-68, 472-73.) During these appointments, Dr. Crickenberger noted steady improvement in the range of motion and the amount of pain in Bowe's shoulder. (R. at 416-23, 466-68, 472-73.) In fact, by February 2005 Dr. Crickenberger noted that Bowe was doing quite well and that she experienced dramatic improvement with therapy. (R. at 416-17, 472-73.) Bowe, herself, noted that she was "definitely better." (R. at 417, 473.) Due to joint pain, Dr. Crickenberger indicated that he would refer Bowe to a rheumatologist. (R. at 417, 473.) However, prior to referral, Dr. Crickenberger ordered a rheumatoid panel to determine if referal was warranted. (R. at 411-17, 472-73.) The results of the rheumatoid panel were negative and all of Bowe's results were in the normal range. (R. at 414.) A bone scan also was performed, which did indicate some areas of uptake in the right knee and degenerative changes in the sacrum and joints of the hand. (R. at 412.) An MRI of the right knee and lower leg was ordered on April 29, 2005. (R. at 411-12, 457-62.) These MRIs found no acute bone or joint space abnormality. (R. at 407-10, 457-60.) Some degenerative changes to the knee and the meniscus were noted. (R. at 405-08, 455-58.) Bowe then began to complain

-17-

of bilateral knee pain; however, Bowe did not have any locking with range of motion. (R. at 405-08, 455-58.) Furthermore, on June 3, 2005, Bowe was examined by Dr. Jeannette M. Capella, M.D., who did not note any knee problems, but who did note that Bowe had not taken any pain medication. (R. at 401.)

On May 2, 2005, Bowe was seen by Dr. Catherine L. Daniel, M.D., a rheumatologist based on Dr. Crickenberger's referral. (R. at 428-32.) Dr. Daniel noted that this visit concerned pain in Bowe's hands and lower back. (R. at 428.) Repeat serologies and x-rays of Bowe's hands were ordered and she was diagnosed with bilateral arthritis of the hands and prescribed Relafen. (R. at 428.) Bowe saw Dr. Daniel again on June 6, 2005, for a review of the tests previously ordered. (R. at 424-427, 444-47.) Dr. Daniel appears to have diagnosed Bowe with inflammatory arthritis over the second and third metacarpophalangeal joints of her right hand and her wrists bilaterally, despite the fact that she noted that all of Bowe's studies, serologies and x-rays have been negative and that her grip strength was only slightly diminished. (R. at 424, 426, 444, 446.) She was prescribed Plaquenil. (R. at 424, 444.)

Bowe sought review of the ALJ's decision by the Appeals Council and submitted additional documents; all of this new materials documents Bowe's condition after the ALJ's decision was entered. (R. at 474-503.)

On November 22, 2005, Dr. Trevar Chapmon, M.D., who specialized in physical medicine and rehabilitation, examined Bowe. (R. at 474-76.) Dr. Chapmon noted that Bowe's diagnoses of fibromyalgia and arthritis remained unchanged and no new diagnoses were made. (R. at 475.) Dr. Chapmon also noted that Bowe had

no sensory abnormalities, her motor function was a four on a scale of five throughout her body except her right arm, which was a three on a scale of five. (R. at 475.) Bowe had crepitus at her right shoulder but no gross deformity and a good range of motion. (R. at 475.) Both of Bowe's legs and her left arm had no gross deformities, a normal range of motion and no joint enlargement or tenderness. (R. at 475.) Bowe was recommended to start Amitriptyline, which she refused. (R. at 475.) Additionally, Dr. Chapmon ordered some new imaging of Bowe. (R. at 475.)

On December 29, 2005, Bowe underwent a CT scan of her lumbar spine. (R. at 477-78.) This scan showed multi-level spondylosis at the L4-5 and L5-S1 levels. (R. at 477.) On January 26, 2006, Dr. Chapmon reviewed this scan and the numerous other imaging procedures, which had been performed on Bowe over the prior five years, and Dr. Chapmon concluded that these images document "no objective findings other than degenerative changes to discs, vertebrae, [and] facet joints." (R. at 499-500.) Bowe's osteoarthritis diagnosis was unchanged, and she was diagnosed with degeneration of the lumbar/lumbosacral disc. (R. at 499.)

On February 15, 2006, an MRI of Bowe's lumbar spine and additional imaging was performed. (R. at 483-91.) On Bowe's MRI screening form, she indicated that she had suffered chronic pain for years but that it was worse now than it had been previously. (R. at 486.) The results of the MRI on Bowe's lumbar spine were found to be comparable to results of the MRI taken on her lumbar spine on September 15, 2003. (R. at 488.) An MRI of her C-spine documented degenerative changes in her middle cervical spine, but no fracture or instability. (R. at 490.) A cerebral MRI was normal. (R. at 491.)

Case 1:06-cv-00077-GMW-PMS   Document 14   Filed 03/15/07   Page 19 of 34   Pageid#: 82

On February 20, 2006, Dr. Chapmon signed a letter to Bowe's attorney, which appears to either have been prepared by Bowe's attorney, or based upon a statement prepared by Bowe's attorney. (R. at 480-81, 496.) This letter adopts Bowe's subjective functional capacity limitations as relayed to Dr. Chapmon by Bowe's attorney. (R. at 480-81, 496.) This statement indicated that Bowe's most recent CT scan indicated significant degenerative changes at multiple levels and of the sacroiliac joints. (R. at 481, 496.) Without reporting the time period he was assessing, Dr. Chapmon stated that "it would be very reasonable" to limit Bowe's work activity to standing or walking no more than two hours a day with frequent breaks, lifting items weighing no more than 15 pounds occasionally or items weighing five pounds frequently, and using her upper extremities only occasionally above the level of the chest. (R. at 481, 496.) Dr. Chapmon made no mention of any limitations in Bowe's use of her hands and fingers.

On March 23, 2006, Dr. Chapmon again stated that numerous imaging procedures over the past five years suggest "no objective findings other than degenerative changes to discs, vertebrae, [and] facet joints." (R. at 494.) At this time, he diagnosed both of Bowe's conditions – lumbar/lumbosacral disc degeneration and generalized, multiple site osteoarthritis – as deteriorated. (R. at 494.)

In addition, Bowe submitted a statement dated March 29, 2006, requesting the Appeals Council grant her disability benefits and detailing her current situation. (R. at 482.) Bowe claimed to have problems with the use of her hands and claimed that she needed to lie down frequently during the day. (R. at 482.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2006), *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2006).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated November 18, 2005, the ALJ denied Bowe's claims. (R. at 19-28.) The ALJ found that Bowe met the disability insured status requirements for DIB purposes through December 31, 2008. (R. at 21.) The ALJ found that Bowe had not engaged in substantial gainful activity since July 24, 2003. (R. at 21.) The ALJ

also found that the medical evidence established that Bowe suffered from severe impairments, namely disorders of the spine, right shoulder and right knee, but the ALJ concluded that Bowe did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21-25.) The ALJ determined that Bowe had the residual functional capacity to perform a wide range of light work that did not involve climbing, moving machinery, unprotected heights and allowed limited reaching with her right arm. (R. at 25.) However, no limitations were placed on the use of Bowe's left upper extremity. (R. at 25.) Thus, the ALJ found that Bowe was unable to perform any of her past relevant work as a production worker, machine operator and bus driver. (R. at 26.) The ALJ noted that transferability of skills was not at issue in this case because all of Bowe's past relevant work was unskilled. (R. at 27.) As a result of these findings, and the testimony of a vocational expert, the ALJ concluded that, based on her age, education, work experience and residual functional capacity, Bowe could perform jobs existing in significant numbers in the national economy, including those of an amusement attendant, a construction flagger and a records clerk. (R. at 27.) Therefore, the ALJ found that Bowe was not under a disability as defined in the Act and that she was not eligible for benefits. (R. at 19, 28.) *See* 20 C.F.R. § 404.1520(g) (2006).

The plaintiff argues that the ALJ's decision is not supported by substantial evidence. Specifically, Bowe argues that the ALJ should have relied on the opinion of Dr. Chapmon over the opinions of state agency physicians. (Brief In Support Of Motion for Summary Judgment, ("Plaintiff's Brief"), at 10.) Second, Bowe argues that the vocational expert's testimony is contrary to the ALJ's finding that Bowe could perform work existing in significant numbers in the national economy.

(Plaintiff's Brief at 10-11.) Third, Bowe argues that the ALJ's decision was erroneously based on Bowe's inability to afford medical treatment. (Plaintiff's Brief at 11-12.) Finally, Bowe argues that the ALJ improperly evaluated her activities of daily living. (Plaintiff's Brief at 12.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided that his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Bowe's first argument is that the ALJ's reliance upon state agency physicians "over the opinion of Dr. Chapmon" is not supported by substantial evidence. (Plaintiff's Brief at 10.) Logically speaking, this argument does not make a great deal of sense. None of the records from Dr. Chapmon were ever provided to the ALJ. Based on the record and the claimant's brief, Bowe's first examination by Dr. Chapmon occurred on November 22, 2005. (R. at 474-76); (Plaintiff's Brief at 6.) The ALJ's decision was issued on November 18, 2005. (R. at 16.) Consequently, the record indicates that Dr. Chapmon's opinions did not exist at the time the ALJ made his decision. Therefore, it is logically impossible for the ALJ to have relied on the opinion of state agency physician's "over" that of Dr. Chapmon, as Bowe has asserted. (Plaintiff's Brief at 10.)

-23-

Dr. Chapmon's records were, however, presented to the Appeals Council. (R. at 10.) The Appeals Council reviewed these records to determine whether or not they provided a basis for changing the ALJ's decision. (R. at 6-7.) Upon request of a party, the Appeals Council may review the decision of the ALJ denying benefits. *See* 20 C.F.R. § 404.967 (2006). If the Appeals Council reviews the case, it may reverse, modify or affirm the ALJ's decision, or remand the case for additional evidence or hearing. *See* 20 C.F.R. § 404.967 (2006). However, the Appeals Council's review is limited. If additional evidence is submitted to the Appeals Council, it must be "new and material." *See* 20 C.F.R. § 404.970 (2006). Furthermore, the Appeals Council considers additional evidence only where it is relevant to the time period on or before the date of the ALJ's decision. *See* 20 C.F.R. § 404.970 (2006). If new, material evidence is submitted to the Appeals Council, it must review the case based on all of the relevant evidence then on record pertaining to the time period on or before the ALJ's decision. *See* 20 C.F.R. § 404.970 (2006); *Wilkins*, 953 F.2d at 95. Evidence is considered "new . . . if it is not duplicative or cumulative," and evidence is considered "material . . . if there is a reasonable possibility that the new evidence would have changed the outcome." *See Wilkins*, 953 F.2d at 96 (citations omitted). If the Appeals Council considers new and material evidence in reaching its decision not to grant review, this evidence becomes part of the record that this court also must consider in determining whether substantial evidence supports the ALJ's findings. *See Wilkins*, 953 F.2d at 96.

In this case, Bowe submitted Dr. Chapmon's records to the Appeals Council and the records were considered. (R. at 6-9.) As a result, this court also must consider Dr. Chapmon's documents as part of the record when reviewing whether

-24-

substantial evidence supports the ALJ's decision in this case. *See Wilkins*, 953 F.2d at 96. However, after properly considering Dr. Chapmon's records, it is this court's opinion that the majority of Dr. Chapmon's records are not relevant to the time period of the ALJ's decision and, thus, do not contradict the ALJ's decision.

On November 22, 2005, Dr. Chapmon saw Bowe for a general visit, not for any new complaints. (R. at 474-76.) This visit was merely days after the ALJ's decision and, thus, was clearly relevant to Bowe's condition during the time period on or before the ALJ's decision. At this visit, Dr. Chapmon clearly indicated that Bowe's diagnoses and the severity of her conditions were unchanged. (R. at 475.) The records of this visit provide no information contradictory to the ALJ's finding and, therefore, these records are not new or material. *See Wilkins*, 953 F.2d at 96. It was not until several months after the ALJ's decision, that the record contained any new and material information on Bowe's condition. At these later dates, the records begin to document an exacerbation of Bowe's symptoms.

On February 15, 2006, during the pre-MRI screening process, Bowe indicated that she had suffered from chronic pain for years but that it was "worse now." (R. at 486.) However, it was not until March 23, 2006, that Dr. Chapmon began to note any deterioration in Bowe's condition, but these notations simply appear to be based on Bowe's subjective complaints, not on any new objective medical evidence. (R. at 494.) Specifically, on March 23, 2006, Dr. Champon noted that numerous imaging procedures over the last five years suggested "no objective findings other than degenerative changes to discs, vertebrae, [and] facet joints." (R. at 494.)

Dr. Chapmon's letter, which is the basis of Bowe's argument on this issue, was

-25-

prepared after Bowe began complaining that her condition has worsened. (R. at 480-81, 496); (Plaintiff's Brief at 10.) Furthermore, this letter appears to have either been prepared by Bowe's attorney or based upon a statement prepared by Bowe's attorney reflecting Bowe's subjective complaints. (R. at 480-81.) The records of Bowe's own statements and of Dr. Chapmon indicate that Bowe's condition worsened only after the ALJ's decision. (R. at 486, 494.) As a result, these later records do not bring to bear any new, material information or diagnoses relevant to the time period the ALJ was evaluating and do not indicate that the ALJ's decision is not supported by substantial evidence.

Bowe's second argument is that the vocational expert's testimony is contrary to the ALJ's finding that Bowe could perform employment existing in significant numbers in the national economy. (Plaintiff's Brief at 10-11.) The claimant also seems to challenge the ALJ's use of the Medical Vocational Guidelines, 20 C.F.R., Part 404, Subpart P, Appendix 2, ("the Grids"). The Grids are a means by which the ALJ can determine whether a claimant who was found, due solely to an exertional impairment or impairments, to be unable to return to their past relevant work. The application of the Grids does not require the use and consideration of vocational expert testimony in cases where the claimant suffers from only exertional impairments. *See Smith v. Schweiker*, 719 F.2d 723, 725 (4th Cir. 1984); *Grant v. Schweiker*, 669 F.2d 189, 193 (4th Cir. 1983). However, if a claimant suffers from both exertional and nonexertional limitations, the ALJ should use the Grids as merely a guideline and also consider the testimony of a vocational expert. *See Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989). In this case, the ALJ did not rely on the Grids as anything more than a guideline and, instead, relied specifically on the testimony of a vocational expert. (R. at 27-28.) As a result, the claimant's argument

with respect to the Grids is misplaced.

Bowe's primary argument, however, challenges the ALJ's use of the vocational expert's testimony to provide substantial evidence to support the ALJ's decision that Bowe could perform jobs which exist in significant numbers in the national economy. (Plaintiff's Brief at 10-11.) This argument is without merit. The Fourth Circuit has held that the testimony of a vocational expert constitutes substantial evidence for purposes of judicial review where his or her opinion is based upon a consideration of all the evidence of record and is in response to a proper hypothetical question which fairly sets out all of the claimant's impairments. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). A hypothetical question is valid if it "adequately reflect[s]" a residual functional capacity for which the ALJ had sufficient evidence. *See Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005). A determination of whether a hypothetical question fairly sets out all of a claimant's impairments turns on two issues: 1) whether the ALJ's finding as to the claimant's residual functional capacity is supported by substantial evidence; and 2) whether the hypothetical adequately set forth the residual functional capacity as found by the ALJ.

In this case, the ALJ's hypothetical question to the vocational expert clearly set out the claimant's residual functional capacity to perform work activities that he later stated applied to Bowe in his opinion. (R. at 25, 525-26.) The ALJ asked the vocational expert to assume that the claimant had a residual functional capacity to lift items weighing 20 pounds or more occasionally, items weighing 10 pounds or more frequently, stand for a total of six hours in an eight-hour work day and sit a total of six hours in an eight-hour work day. (R. at 526, 528.) The ALJ also stated that the claimant was limited in her ability to climb, as well as in her ability to be exposed to

-27-

hazards including machinery and heights. (R. at 526, 528.) Finally, the ALJ stated that the claimant was limited in her ability to reach overhead and straight forward with the right arm. (R. at 526, 528.)

Based on these limitations, and the claimant's age and educational background, the vocational expert testified that the claimant could perform unskilled light or sedentary work. (R. at 526-27.) The vocational expert testified that, based on the limitations the ALJ described, the claimant could perform a limited set of all the possible light work jobs. (R. at 529.) The vocational expert speculated that approximately 80 to 85 percent of light work jobs would be eliminated by the limitations described. (R. at 529.) However, the vocational expert stated that there were still a significant number of jobs the claimant could perform. (R. at 526-28.) The vocational expert stated that 800,000 jobs as an amusement attendant existed nationally and 15,500 existed within the state, 69,000 jobs as a construction flagger existed nationally and 1,200 existed within the state and 101,000 jobs as a records clerk existed nationally and 2,000 existed within the state. (R. at 526-27.)

In *Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979), the Fourth Circuit held that 110 jobs within the region constituted a significant number, and in *Craigie v. Bowen*, 835 F.2d 56, 58 (3rd Cir. 1987), the Third Circuit held that 200 jobs in the region was a clear indication that there existed in the national economy substantial gainful employment which the claimant could perform. Therefore, this court believes that substantial gainful employment existed which the claimant could perform. As a result, pursuant to Fourth Circuit case law, the vocational expert's testimony constitutes substantial evidence in support of the ALJ's finding that Bowe could perform jobs which exist in significant numbers in the national economy,

-28-

x

assuming that the residual functional capacity outlined by the ALJ in his opinion is supported by substantial evidence.

The ALJ found that Bowe had the residual functional capacity to perform unskilled light work that did not involve climbing, hazards, moving machinery, heights and reaching with her right arm. (R. at 25.) Bowe has challenged only one aspect of this residual functional capacity determination that the ALJ put forward to the vocational expert, Bowe's ability to use her right hand. (Plaintiff's Brief at 11.) The ALJ determined that Bowe's alleged hand and wrist impairment was not severe. (R. at 24.) This determination is supported by substantial evidence.

The Fourth Circuit has held that an impairment is not severe if it can be considered a slight abnormality that has a minimal impact on a person and would not be expected to interfere with an individual's ability to work. *See Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984) (citations omitted)). The ALJ noted that while Bowe claimed to be extremely limited in the use of her hands, there were no objective medical findings to support the degree of limitation she described; thus, the ALJ found her claim to be not entirely credible. (R. at 24-25.) In fact, no treating or examining physician has described the type of limitations on Bowe's ability to use her hands that she has alleged. Even Dr. Chapmon, in his statement about Bowe's ability to perform work related activities, prepared after Bowe's condition had deteriorated as previously discussed, did not place any limitations on Bowe's ability to use her hands. (R. at 481, 496.) Instead, Dr. Chapmon stated that Bowe should limit the use of her arms above the chest to prevent shoulder injury. (R. at 481, 496.) Furthermore, Dr. Hays and Dr. Johnson, state agency physicians, found that Bowe was unlimited in her

ability to use both of her hands for fingering, handling and feeling. (R. at 24, 385.) Thus, none of the doctors who examined how Bowe's alleged impairment impacted her ability to perform work related functions has ever found any limitation on Bowe's ability to use her wrists, hands or fingers.

Moreover, the objective medical evidence also does not support Bowe's subjective claim of a severe, debilitating hand impairment. While her doctors have noted arthritis in Bowe's hands and wrists, Bowe had a rheumatiod arthritis panel performed and all of the test results came back in the normal range. (R. at 414.) All of her x-rays, serology testing and other studies came back negative with respect to her hand or wrist impairment. (R. at 414, 424.) Furthermore, upon examination, her wrists were consistently found to have no swelling and a normal range of motion. (R. at 426, 431.) Her hands were found to have some swelling and tenderness of the second metacarpophalangeal joint, but the remainder of her hand and finger joints were found to have no swelling, a normal range of motion and only slightly diminished grip strength. (R. at 426, 431.) Based on these findings, Bowe's rheumatologist, Dr. Daniel, did not place any limitations on Bowe's ability to use her wrists, hands or fingers. Therefore, substantial evidence supports the ALJ's finding that any impairments to Bowe's wrists, hands or fingers were not severe because they did not limit her ability to perform work-related functioned. *See Evans*, 734 F.2d at 1014. As a result, the ALJ's hypothetical to the vocational expert adequately set forth a valid residual functional capacity assessment and, thus, constitutes substantial evidence to support the ALJ's finding that Bowe could perform work available in the national economy. *See Johnson*, 434 F.3d at 659; *Walker*, 889 F.2d at 50.

Bowe's third argument is that the ALJ's decision was erroneously based on her

inability to afford medical treatment. (Plaintiff's Brief at 11-12.) This argument appears to be based on statements made by Bowe's attorney during Bowe's hearing before the ALJ and a statement made by the ALJ in his opinion. (Plaintiff's Brief at 11-12.) This argument is baseless.

At Bowe's hearing, statements were made by Bowe, her sister and her attorney indicating that she was experiencing financial difficulties. (R. at 519, 524, 530-31); (Plaintiff's Brief at 11-12.) The following statement was later made in the ALJ's opinion; "[Bowe's] limited need for pain analgesics or other more aggressive treatment modalities belies her allegations of disabling symptoms." (R. at 25.)

The Fourth Circuit has held that "[a] claimant may not be penalized for failing to seek treatment she cannot afford." *Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986.) From a review of the record, the ALJ's decision and the ALJ's statements made during Bowe's hearing, this court does not believe the ALJ's decision was, in any way, improperly based on Bowe's financial situation. The ALJ's statements in his opinion regarding Bowe not needing additional pain medication or more aggressive treatment were proper conclusions based on overwhelming substantial evidence, not conclusions based on Bowe's inability to afford treatment.

Bowe has submitted that it would be difficult "to obtain more aggressive treatment when there are no funds to pay for that treatment." (Plaintiff's Brief at 12.) This may well be the case, however, it is even more difficult to obtain more aggressive treatment if the patient does not seek that treatment from her numerous treating physicians or make any indication that more aggressive treatment is necessary. In the past, when her doctors felt it was warranted, Bowe received more

aggressive pain treatment. During her recovery from surgical procedures, Bowe received much more powerful pain treatment including being placed on OxyContin and Percocet for a short period of time.[8] (R. at 134-35.) However, the record does not indicate that Bowe or her doctors thought that continuation of this sort of pain medication was necessary and she simply remained on Darvocet.[9] Also, there were no indications in the record that was before the ALJ that her doctors failed to continue more powerful pain medication for financial reasons. In fact, Dr. Samarasinghe, a pain management specialist, specifically explained more profound treatment with Bowe and, after examining Bowe, he found that she was not a candidate for opioid therapy. (R. at 132.) Additionally, on at least one occasion, June 3, 2005, in the midst of Bowe's alleged period of disability, Bowe noted to Dr. Capella that she was not taking any pain medication. (R. at 401.)

The record indicates that on other occasions Bowe was able to request and receive aggressive treatment despite her financial situation. For example, when Bowe was diagnosed with a paraspinous cyst, she elected to have it removed surgically, despite the fact that her doctors did not believe that her back pain was related to this cyst, and Dr. Strain, who performed the surgery, indicated that it might even increase her symptoms. (R. at 142, 143-46, 195.) As a result, it is clear that, despite Bowe's financial situation, she was able to request and receive treatment, even elective surgery, through whatever medical care resources were available to her.

The ALJ never stated or insinuated that he found the plaintiff was not disabled

---

[8] Oxycontin is used for the treatment of moderate to severe pain. *See* PHYSICIAN'S DESK REFERENCE, ("PDR"), 2819 (Thompson 59th ed. 2005). Percocet is used for the treatment of moderate to moderately severe pain. PDR at 1223.

[9] Darvocet is used for the treatment of mild to moderate pain. PDR at 402.

-32-

because of the lack of medical treatment she received. Instead, the ALJ based his decision on the fact that the medical records of treatment she did receive demonstrated that she was not disabled. The ALJ's conclusion, that the primary factor contributing to Bowe not seeking additional treatment for her alleged impairment was Bowe's inaction caused by an impairment not as severe as she claimed it to be, is supported by substantial evidence in the record. This court is of the opinion that Bowe's financial situation had no bearing on the ALJ's decision.

Bowe's final argument that the ALJ improperly considered Bowe's activities of daily living is misplaced. The ALJ may examine a claimant's activities of daily living. *See* 20 C.F.R. § 404.1512(b)(3) (providing that statements made about a claimant's daily activities can be used by the ALJ as evidence in making a disability determination). In this case, the ALJ scrutinized Bowe's stated activities of daily living both inside and outside of the home. Pursuant to 20 C.F.R. § 404.1512(b)(3), this consideration was proper.

It is this court's belief that, based on all of the relevant evidence in the record, the ALJ's opinion is supported by substantial evidence. Thus, the ALJ's decision will be upheld.

## IV. Conclusion

For the foregoing reasons, the Commissioner's motion for summary judgment is sustained, and the decision of the Commissioner denying benefits will be affirmed.

An appropriate order will be entered.

Case 1:06-cv-00077-GMW-PMS   Document 14   Filed 03/15/07   Page 33 of 34   Pageid#: 96

**DATED:** This *15* day of March, 2007.

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE

Case 1:06-cv-00077-GMW-PMS   Document 14   Filed 03/15/07   Page 34 of 34   Pageid#: 97